UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :   CRIMINAL NO. 09-158(ESH) |
| ANDREW WARREN, | : |
| Defendant. | : |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

### I.   BACKGROUND

The defendant comes before the court to be sentenced pursuant to his guilty plea to one count of Abusive Sexual Contact, in violation of 18 U.S.C. §2244A(a)(1) and to his guilty plea to a second count of Possession of a Firearm by Unlawful User of a Controlled Substance, in violation of 18 U.S.C.§ 922(g)(3). The facts underlying these offenses are as follows:

#### A.   Andrew Warren's Assignment

Andrew Warren ("Warren") is a national of the United States. In and around February 2008, Warren was employed by the United States Central Intelligence Agency, and was assigned to the United States Embassy in Algiers, Algeria.

While Warren was assigned to work at the United States Embassy in Algeria, he was provided a house which was leased and paid for by the United States Government. Warren was the sole occupant of the house, and he used it as a residence while in Algeria. This residence is within the special maritime and territorial jurisdiction of the United States, because the residence

1

was used for the purposes of the United States mission in Algeria and also was used by Warren as a residence while he was assigned to the United States mission in Algeria.

**B. How Warren Met Person A**

Person A is an international business consultant who regularly meets and works with governmental and diplomatic officials in numerous foreign countries. She holds a masters degree and speaks at least four languages fluently. In and around 2007, Person A was introduced to Warren at a diplomatic function in Africa. Person A was accompanied by several of her co-workers at this diplomatic function, and at several other diplomatic functions were she encountered Warren over the course of several months. Warren informed Person A and her co-workers that he was an American diplomat, who was being assigned to work as the "second in command" at the United States embassy in Algeria. Person A was a national of Algeria, and she offered to introduce Warren, whom she thought was a high ranking diplomat, to several personal and professional contacts during his posting in Algeria. Warren and Person A were mere acquaintances and did not have a romantic or sexual relationship.

**C. The Assault at the Residence**

On February 17, 2008, Person A was on a short visit to Algeria and was running errands in the downtown area of Algiers before she left. She was scheduled to depart Algeria very early the next morning to accompany her parents to a medical appointment in Europe. In the early evening of February 17, 2008, Warren spoke to Person A on the phone, and told her that she was running errands in a part of town that was very close to his house. Warren invited Person A to his house, and she drove her car to Warren's residence. At his residence, Warren made two drinks for Person A. As Person A began to consume the second drink, she suddenly became very ill. Person A immediately passed into semi-consciousness, and at times

unconsciousness. Person A described this feeling as nothing she had ever felt before in her entire lifetime. According to Person A, she did not feel drunk; rather it felt like she was paralyzed – that she knew what was going on around her, where she was, and what Warren was doing - however, she could not move her body. Person A described a feeling of complete and utter loss of muscular control. While Person A was rendered unconscious, Warren moved Person A from the bathroom floor of his house to his bedroom and onto his bed. As she was lying on the bed, Warren removed her clothing, and Person A was able to see that Warren removed his clothing. Warren then had sexual contact with Person A[1]. Person A stated that she could not move her arms or legs, and she described that it felt like Warren was having sexual contact with "a dead person".

Person A passed into unconsciousness again, and became conscious some time later. She somehow made her way to her car and drove home. To this day, she doesn't remember driving home from Warren's residence to her family's home.

Person A traveled with her parents to Europe early the next morning on September 18, 2008 for a previously scheduled medical appointment. Person A did not tell her parents what had happened to her just a few hours before the flight - and still has not told them to this day - to do so would be, in her estimation, unthinkable. However, once in Europe, Person A reported the incident to her physician.

### D. The Report to the United States Embassy in Algiers, Algeria

Although Person A reported the incident to her doctor, she did not report the incident to law enforcement. Indeed, according to her, it would have been – and still is - not an option to report to local law enforcement in Algeria. The humiliation, shame, and blame would be too much to bear.

---

[1] Person A wrote a letter to the Court which has been filed UNDER SEAL.

Finally, in September, 2008, despite her incredible fear, Person A arranged to speak with a high ranking diplomatic official at the United States Embassy in Algeria. Person A stated that she decided to report the incident to Warren's employers because she did not want what had happened to her to happen to another unsuspecting woman. Person A reported the incident o the Deputy Chief of Mission (DCM). On that day, needless to say, her life changed. The DCM immediately reported to the Regional Security Officer (RSO), and an investigation was launched. As part of the investigation, a search warrant was executed at Warren's residence, and numerous drugs, including Valium and Xanax were found in his residence. An expert witness opined that these drugs mixed with alcohol would have caused the symptoms - including the feeling of paralysis and the loss of consciousness - that were experienced by Person A on the night of February 17, 2008.

Weeks later, the defendant was expelled from the mission in Algiers and sent back to the United States to report to his employer. The defendant was interviewed by law enforcement when he returned to the United States, and he stated that he did have sexual contact with Person A, but he claimed that it was consensual.

In the meantime, upon receiving the report from the DCM, the RSO in Algeria immediately recalled another allegation against Warren that was made by a different woman several months earlier. That complaint was reported to the RSO by a military officer. The military officer told the RSO about a conversation he had with an Algerian National (hereinafter referred to as "Person B"). Person B reported to the military officer that Warren had sexual contact with her at his residence without her consent. Person B had no intention of reporting the incident to the RSO or any law enforcement entity, but told the military officer about what had happened to her. Person B thought that any official report would only result in shame and

humiliation falling on her. Person B also felt that even if she did report the incident, she did not believe it would result in any repercussions against Warren, due to his position at the embassy. Subsequently undersigned counsel had the opportunity to interview Person B.

### E. The Sexual Contact Allegation from Person B

Person B is also a young Algerian national. Person B does not know Person A. Person A and Person have never spoken to each other and did not know about each other. It was not until information about the investigation was leaked to the media, that either of the women knew that other victims existed. The leak occurred many months after the second assault.

The investigation revealed that in September, 2007, the defendant invited several individuals to his residence in Algiers, Algeria. Several American men employed at the embassy in Algeria were at the party, as well as Person B and her female friend, Person X. During the course of the party, the defendant provided Person B with alcoholic drinks. Warren made the drinks for Person B in his kitchen, and he walked to the living room area of his house and handed the drinks to Person B. Person B willingly and happily consumed the drinks. Person X was with her friend, Person B for the entire party, but Person X was not drinking any alcohol.

The party was lively and at one point Person B began dancing. Her friend, Person X, videotaped the dance with her cell phone. It is very clear that the victim, although clearly intoxicated, was very much in control of her body and mind. It is important to note that Person B was fully clothed during the dance, in pants and a shirt, and that she performed acrobatic skills during the dance, including backbends and rolls. A few minutes after she finished the dance, Person B became violently ill. Person B described the illness as nothing she has ever felt before. According to Person B, it did not feel like she had too much to drink or even resembled the

feeling of being drunk[2]; instead, it was a feeling like she could not walk and had difficulty maintaining consciousness. She felt so sick that she had to be assisted by her female friend, Person X, to a nearby spare bedroom (the two women had never been to Warren's house before, so Person X was directed into this spare room by Warren). Person B could not walk without assistance from her female friend. After entering the spare bedroom, Person B passed into a semi-conscious, then into full unconsciousness. Person X took off her pants and shirt, folded them and put them on the night stand next to the spare bed. Person X then started to get into the same bed as her friend, but the defendant stopped her. He told her that he had another spare bedroom, and he led her to the room which was located upstairs. During this time, all other people who attended the party left the residence. The only people who remained in the house were Warren, Person B and Person X.

The next morning, Person B woke up in the downstairs spare bedroom completely nude, and she felt irritation in her genital area. This lead her to believe that someone had sexual intercourse with her during the night. However, due to her physical condition and sickness the night before, Person B had absolutely no recollection of anything that happened the previous night once she became violently ill. During the night, sometime after her female friend put Person B in bed, someone entered the spare bedroom, removed Person B's bra and underwear while she was unconscious, left the bra and underwear lying on the floor next to the bed, and left what appeared to be a used condom on the floor next to the bed. The defendant made a statement

---

[2]Person B would describe herself as someone who consumes alcohol on a regular basis. In her life, she has had many drinks–and has even had way too much to drink–so much that she has been sick before. This "sick"; however, was nothing she had ever felt before. Indeed when she threw-up, she did not feel that whatever was making her sick was purged from her body.

admitting that he had sexual contact with Person B, but the defendant claimed that it was a consensual sexual contact.

### F. Bench Warrant for Failure to Appear, Arrest and Possession of Firearm while Using Cocaine

In April, 2010, Warren failed to appear for a status hearing. After counsel for the defendant was unsuccessful in his attempts to secure the defendant's presence in Court, a bench warrant for his arrest. Following the issuance of the bench warrant, members of the Diplomatic Security of the United States Department of State began to try to find Warren[3]. After several days they found him in a motel room in Norfolk, Virginia. Defendant was high on crack cocaine and was carrying a fully loaded 9 millimeter semi-automatic Glock pistol in the front pocket of his shorts. Defendant refused to obey the repeated commands of the officers, who clearly identified themselves to the defendant, and for several moments he began crawling, standing and kneeling away from the officers. When an officer tried to approach the defendant with handcuffs, he tried to run away and began to physically resist arrest. Defendant did not comply with the officer's requests, and began to reach toward the front pocket of his shorts. Officers reacted to his active struggling and with his reaching toward his pocket by using a taser. After a violent, unpredictable and dangerous struggle, officers were finally able to subdue the defendant and put him into custody.

---

[3] During the course of the quest to find the defendant, agents discovered that another complaint had been made against Warren in Norfolk, Virginia involving a female neighbor who stated that Warren came over to her house one morning, exposed his genitalia to her, asked to use the bathroom, then masturbated in her bathroom. This neighbor contacted the police and made a formal complaint against Warren.

7

## II.  SENTENCING CALCULATION

A.  Statutory Maximums

Count One:  A violation of Title 18, United States Code, Section 2244(a)(1) carries a maximum sentence of 10 years in prison, a fine of $250,000, and a term of supervised release of between five years and life.  See 18 U.S.C. §§ 3571(b)(3), 3583(k).

Count Two:  A violation of Title 18, United States Code, Section 922(g)(3) carries a maximum sentence of 10 years in prison, a fine of $250,000, and a term of supervised release not to exceed three years.  See 18 U.S.C. §§ 3571(b)(3), 3583(a)(2).

B.  Sentencing Guidelines Calculation

The Guideline calculation in the Presentence Report places the defendant's total offense level at 33.  See PSR ¶ 39.  This calculation contemplates a base offense level for Count One at 30[4] (¶ 18) and a four level enhancement for conduct described at 18 U.S.C.§

---

[4] As the Government submitted in our objections to the PSR, our position is that the Base Offense Level as 30 is inaccurate since the cross-reference to USSG Section 2A3.1 does not apply.  The government submits that pursuant to USSG Section 2A3.4(a)(1), a base offense level of 20 applies since the defendant plead guilty to the offense of Abusive Sexual Contact 18 U.S.C. § 2244(a)(1), which states that "whoever ... knowingly engages in or causes sexual contact with or by another person, if so to do would violate – subsection (a) or (b) of section 2241 of this title had the sexual contact been a sexual act ..." During the plea hearing and in statements contained in the statement of offense submitted by the defense to the Court, the defendant admitted that he rendered the victim unconscious and touched the victim's genitalia with his penis with the intent to arouse the sexual desire of himself. The distinction between Aggravated Sexual Abuse in § 2241 and Abusive Sexual Contact in § 2244 hinges upon the distinction between "sexual act" and "sexual contact". In other words, § 2241 requires a "sexual act", and § 2244 requires only "sexual contact". "Sexual act" is defined in 18 U.S.C. § 2246 (2)(A) as "contact between the penis and the vulva ... and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight."

"Sexual contact" is defined in 18 U.S.C. § 2246(3) as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or satisfy the sexual desire of any person" The language in the statement of offense was carefully crafted to delineate

8

2241(b)), See PSR ¶ 19, and two level enhancement for vulnerability of the victim, See PSR ¶ 20, minus three levels for acceptance of responsibility, See ¶ 38.

With respect to Count Two, the base offense level is calculated at 14 (¶ 25) with a two-level enhancement for obstruction of justice (¶ 29) but with the "multiple count adjustment" there is a 0 increase in offense level (¶ 36). Therefore, the combined adjusted offense level was calculated at 36 (¶36) and a criminal history score of 0, and his criminal history category as I (¶ 42). Thus Defendant's total offense level is 33 and the Guideline range for the defendant is therefore calculated at 135 to 168 months of imprisonment. See PSR ¶ 73.

### III. GOVERNMENT'S RECOMMENDATIONS

---

elements of § 2244 "sexual contact" as opposed to "sexual act". The defendant admitted that after rendering the victim unconscious, he touched the victim's genitalia with the intent to arouse his sexual desire. This language tracks the statutory definition of "sexual contact". Pursuant to the statutory definitions contained in § 2246, penetration of the vulva is the crux of the distinction between Aggravated Sexual Abuse and Abusive Sexual Contact. In other words, penetration of the vulva turns a "sexual contact" into a "sexual act". The defendant made no admissions at the plea hearing or in the statement of offense regarding penetration of the victim's vulva. The PSR indicates that USSG § 2A3.4(a) applies (base offense level of 20), but that the cross reference in subsection (c)(1) also applies. Specifically, the cross reference states that "if the offense involved criminal sexual abuse or attempt to commit criminal sexual abuse (as defined in 18 U.S.C. §§ 2241 or 2242), apply § 2A3.1" Thus, in applying this cross reference, the base offense level goes from 20 to 34, because the offense involved conduct described in § 2241(a) or (b). Thus, the government's position, at the time of the plea hearing and now, is that the cross reference described in § 2A3.4 does not apply, and a base offense level of 20 is proper. The reason that the government does not believe that the cross reference applies relates to the statutory definition of "sexual abuse". As noted above, the federal statues criminalizing "sexual abuse" (18 U.S.C. §§ 2241 and 2242) require the commission of a "sexual act". The USSG cross reference makes no distinction between "sexual act" and "sexual contact", but simply uses the term "sexual abuse". It is clear from the context of the statutes criminalizing sexual misconduct in federal law, however, that the code equates "sexual abuse" to what is defined as a "sexual act" in 18 U.S.C. § 2246 (i.e. penetration of the vulva by the penis). Since the defendant plead guilty to, and admitted to an act defined as "sexual contact", the base offense level of 20 should apply to the this case.

For the reasons set forth below, the government respectfully recommends that the Court sentence the defendant to the high end of the sentencing guideline range for the offense of abusive sexual contact as described in Count One of the superceding information (along with the guideline range of Count Two). That is, to a 33 month prison term followed by a 10 year term of supervised release with the standard conditions including registration as a sex offender and psychiatric and substance abuse treatment. This sentence satisfies the requirements set forth in Title 18, United States Code, Section 3553(a). This recommendation is based on the guideline which was calculated in the plea agreement which would have been 18. This contemplates a base offense level of 20, plus 1 for Count Two, minus 3 for acceptance of responsibility.

A. <u>Victim Impact Statement</u>

The victim impact statement for Person A has been submitted under seal by a separate motion. Although undersigned counsel made significant efforts to obtain a victim impact statement from Person B, we were unable to do so.

B. <u>Basis for Government's Sentencing Recommendation</u>

The government is requesting a sentence within the Guideline range which was contemplated in the plea agreement. Such a sentence is supported by the facts surrounding the defendant's offense.

Turning specifically to the § 3553 factors, without question the defendant's conduct in drugging Person A and having sexual contact with her without her consent, shows a man who is manipulative, and depraved. Defendant's action deeply damaged Person A. Defendant, not only had a deep and intellectual knowledge about the cultural taboos of that country, he used his

knowledge to degrade and abuse two young and unsuspecting women. He did this for his own sexual gratification, and he did it in a way to ensure that he would not get caught. The defendant was certain that his actions would go unnoticed since he knew (or thought he knew) that the women would never report to law enforcement what he did, based upon his knowledge of the culture in Algeria and the rights and privileges that he enjoyed as a U.S. Diplomat overseas. The defendant viewed himself as royalty in that country, living in a mansion, having whatever he wanted at his disposal and thinking that he could also have women without their consent and that they would never tell what he did to them because of his position and power at the United States embassy. The victim was humiliated and shamed beyond recognition, and left with a terrible burden to carry for the rest of her life.

### The Defendant

The defendant has claimed that he went into a downward spiral. However, the government asserts that his downward spiral did not begin until he was caught, and a light was shined on his abominable conduct.[5] The absence of remorse for his actions is notable. Nowhere, either in court or in the presentence report, has the defendant apologized to the victim. The defendant's "downward spiral" did not cause him to commit the sexual offenses against Persons A and B - it was in getting caught that has caused the defendant such remorse.

---

[5] Defendant's other basis of departure is for mental and emotional conditions. This request is baseless. §5H1.3 may only be a departure condition when the defendant's "criminality is related to the treatment problem to be addressed". See §5C1.2, Application Note 6. Clearly, that departure doesn't apply to the defendant who tells Dr. Blumberg that it was the *allegations*--both overseas and in Virginia and *media exposure* that begot his downward spiral. Moreover, his drug use and mental illness didn't cause his criminal acts since according to the Defendant in the report to Dr. Blumberg, he did not commit the sexual assaults both overseas and in Virginia.

Further, the defendant has asked this Court to consider his public service, as has requested a downward departure based on his employment with the United States. This is ironic, considering that he used the cultural knowledge that he gained from his employment to perpetrate his crimes - to choose Muslim victims who were unlikely to report the crimes based on the cultural stigma they would encounter as being victims of sexual offenses. Further, he told these victims that he was a high ranking diplomat from the United States - and the victims believed that they would be safe with him because of his position. They let down their guard, because of who the defendant was employed by. If anything, his employment with the United States should be used as a factor to sentence him at the high end of the sentencing guidelines, as opposed to giving him a downward departure.

## IV.   CONCLUSION

Wherefore, the government respectfully requests that the Court sentence the defendant to the high end of the guidelines followed by a ten year term of supervised release.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

_____/s/_____
JULIEANNE HIMELSTEIN
Assistant United States Attorney

_____/s/_____
CHRISTINE DUEY
Special Assistant United States Attorney